P. M. GILBERT, PLAINTIFF IN ERROR, V. THE MERRIAM & ROBERSON SADDLERY COMPANY, DEFENDANT IN ERROR.

[FILED APRIL 3, 1889.]

1. **Instructions to Jury.** An instruction by which it is sought to cover the whole case, and upon which, if met by the evidence, the jury is instructed to find in a certain way, should include all the elements necessarily involved in the case and within the evidence. (*Runge v. Brown*, 23 Neb. 817.)

2. ———. The third instruction asked by the defendant correctly expresses the law arising upon the evidence in the case, and not contained in any instruction in the case, and ought to have been given.

3. **Evidence:** ACCOUNT BOOKS. Books of account are receivable in evidence only when they contain charges by one party against the other, and then only under the circumstances and verified in the manner provided by statute. (*Van Every v. Fitzgerald*, 21 Neb. 36.)

ERROR to the district court for Richardson county. Tried below before BROADY, J.

*Frank Martin*, for plaintiff in error.

*C. Gillespie*, and *E. W. Thomas*, for defendant in error.

COBB, J.

This action was brought in the district court of Richardson county, by the Merriam & Roberson Saddlery Company, against one P. M. Gilbert, on an account for saddlery goods, saddlery hardware and findings, alleged to have been sold by the plaintiff, a wholesale dealer in Kansas City, Missouri, to the defendant, a retail dealer at the town of Oxford, Kansas.

The petition is in the usual proper form, setting out the corporate capacity of the plaintiff and the account against the defendant for goods, wares, and merchandise, sold and delivered, and claiming a balance due on the account amounting to the sum of $602.44, together with the plaintiff's bill of particulars.

The defendant's answer is a general denial.

There was a trial to a jury, with a verdict and judgment for the plaintiff. The defendant's motion for a new trial having been overruled, he brings the cause to this court on the following assignments of error:

I. The court erred in giving the second and third instructions on its own motion.

II. In refusing to give the first, second, and third, instructions asked by defendant.

III. In admitting in evidence the cash book and the entries therein.

IV. In requiring the defendant to produce said book, and deliver it to the plaintiff.

V. In admitting in evidence the entries in said book on pages 44 to 71 inclusive, and on page 379.

VI. In admitting in evidence the entries in said book not in the handwriting of defendant nor made by his authority.

VII. The verdict is not sustained by sufficient evidence, and is against the evidence.

VIII. In overruling the objections of the defendant to testimony offered by the plaintiff, as shown by the bill of exceptions.

IX. In overruling the motion for a new trial.

It appears from the evidence in the bill of exceptions that the defendant Gilbert, at that time at Oxford, Kansas, in the latter part of October, 1885, bought a small saddlery and harness business, and continued the same, in his own name, at Oxford. In the months of October, November, and December, of said year, he made small purchases of saddlery and harness goods of the plaintiff at its store in Kansas City, which were shipped by express to the store of defendant at Oxford, as to which there is no dispute. Gilbert himself was not a saddler nor harness maker, nor did he have any special knowledge of the trade. At the commencement he had in his employ a saddler and harness maker named Riley, but shortly after going into the business he was discharged, and one W. N. Hart, a saddler and harness maker, was employed by Gilbert. The evidence is sharply conflicting as to what this man was hired to do, especially in the absence of Gilbert. Early in January, 1886, Gilbert having business at Stella and Falls City, Nebraska, left his home and business at Oxford and came to Nebraska. It may be assumed as true and uncontradicted that he left his shop and business in the charge of Hart. Gilbert states in his testimony that Hart "was a harness maker," and that he hired "him to do common work in the shop," and repeatedly states that "Hart only had the authority of a journeyman saddler and harness maker; that his chief duties were to repair and do all jobs of repairing which might come in, but that in the absence

of the owner he had authority to sell such articles as were
kept for sale, and to receive the money therefor." He re-
peatedly states that this was the extent of Hart's authority,
and particularly that he had no authority to buy nor to or-
der the purchase of goods. He also testifies that soon after
starting the business he wrote to the plaintiff a letter, in
which he expressly warned it not to fill any order for
goods without his name accompanying the order. This
letter, dated October 26, 1885, was introduced in evidence
by the plaintiff, and appears in the bill of exceptions. It
contains the following paragraph: "May send you another
small order soon, but fill no order without my name ac-
companying it." He further testified that at the time he
left Oxford on his way to Nebraska, in 1886, he passed
through Kansas City and stopped at the store of the
plaintiff; that in conversation with Frank Merriam, pres-
ident of the company, Merriam asked him whether, in case
the man whom he had left at his shop at Oxford might
need something while he, Gilbert, was gone, and make an
order on plaintiff for it, the order should be filled; that he
replied as follows: "I answered, 'No; I don't allow any-
body to order goods unless it comes from me,' and said:
'When I come back—I don't know how long I shall be
gone—I will come through Kansas City, and I may need
some spring goods; but I have got all the common goods I
want. I will only want a small order, and will buy as I
come back through here.'" On the contrary, Frank Mer-
riam, president of the plaintiff company, when on the stand
as a witness, testified that the second time he saw defend-
ant, Gilbert, was in the month of December or January,
1885 or 1886. He said he wanted some more goods, and
wanted Roberson to let him know when he would be there,
and said if he was not at Oxford when Roberson arrived
there, that his man Hart would give Roberson an order for
goods.

The deposition of W. N. Hart, taken at Dallas, Texas,

was read in evidence, in which he testified that Gilbert placed him in charge of his saddlery business at Oxford; that along about the last of December, 1885, or first of January, 1886, Gilbert started to go to Nebraska, but on account of a severe snow storm, was detained about three days; that on the evening when he was ready to leave the second time he told him: "'Hart, I am going up to Nebraska on business. Don't know when I will be back. Roberson, the traveling man, for Merriam's Saddlery Company, will be here on the 27th of January. You buy such goods as you may need from him. I don't know anything about the business. You know what you need better than I do;' and if I needed anything I did not buy from Roberson, then I should send on to the house of the Merriam & Roberson Company after it and they would send it to me. He said he was going through Kansas City on his way to Nebraska, and that he would tell them, Merriam and Roberson, that I would need some goods, and for them to let me have them;" that he told him this in the store room at Oxford the evening that he left, in the presence of deponent's brother, Harry E. Hart, and two other young men whose names are not remembered, but thought one of them was Tom Brady and the other Ed Gilbert. Deponent described with particularity the place in the store where Gilbert was then sitting, and where deponent was standing, and where the brother, H. E. Hart, was standing, when the conversation was had wherein, as the witness expressed it, Gilbert gave him the authority to purchase goods from Merriam-Roberson's Saddlery Company. He also described the manner in which Gilbert, as he was taking his leave and after he had got out of the store, came back and said to witness, "I want you to take charge of this business, and run it the best you know how." Witness asked him when he would be back. . He replied that he did not know when he would be back. The witness also stated that on or about January 28, 1886, Roberson, the

traveling man of the plaintiff, arrived at the store at Oxford, and that witness, pursuant to the orders of Gilbert, bought by sample from him thirteen or fourteen hundred dollars' worth of goods, and made three other small orders for goods, and gave Roberson another order about March 13, 1886; that all the goods ordered by him for Gilbert were sent to the store as ordered; and that P. M. Gilbert returned to Oxford and was in the store after all these goods were received and were opened and arranged by deponent; that Gilbert looked around the store and said to deponent, "Well, you have got a nice store here now.   I would not be ashamed for my friend Filley to see it now. I am glad you have the taste to arrange goods so well, etc;" that Gilbert seemed pleased with the stock of goods deponent had purchased from the Merriam-Roberson Saddlery Company, and made no objection at all to his having bought the goods.

The deposition of H. E. Hart, taken at Wichita, Kas., was also read in evidence at the trial, in which he stated that about the middle of January, 1886, Tom Brady and Ed Gilbert being present, the defendant, Gilbert, told the brother of deponent to "buy the goods whatever he may need in the business, and to run it the best he knew how;" that this conversation occurred in the store-room.

All this evidence of Merriam and the two Harts is expressly contradicted and denied by Gilbert, and from the bill of particulars attached to the plaintiff's petition, it appears that a bill of goods amounting to $159.01 was purchased January 13, 1886, and one of $2.25 on the 15th of same month.   There does not appear to have been any order made for the bill of January 15, but there is one dated January 14, 1886, for the gig saddle sent by express on the 15th, and this at a time when all testimony agrees that Gilbert was not at Oxford, and was gone nearly half a month before the time of making the purchase, according to Hart's deposition.

It further appears, from Gilbert's testimony, that about the first day of March he made a hurried trip from Nebraska to Arkansas City, Kas., and on his way, (either to or from, which does not appear,) he stopped at his home at Oxford, and there learned for the first time that goods had been ordered by Hart, and brought into his shop or store during his absence. Gilbert states that immediately upon learning the fact, he informed Merriam & Roberson that the goods had been ordered without his authority; that they were subject to their order, and that he was ready to ship the same back to them; and that he immediately ordered Hart not to sell or dispose of any of the goods. The letter written by Gilbert to plaintiff, March 4, 1886, introduced by plaintiff, and attached to the bill of exceptions, as a part of exhibit E, which is presented in full, is doubtless what Gilbert refers to as information to Merriam & Roberson :

"OXFORD, March 4, 1886:

"*Messrs. Merriam & Roberson, Kansas City:* I this day returned home on a hurried trip; am obliged to return to Nebraska on a short trip again. I will inclose you a draft for $100 on my old account. Will see to sending balance soon as I return.

"I am much surprised to find so many goods ordered by Mr. Hart. I gave no such orders; and amongst them are many things not salable in this market; other things overstocked. What shall be done? Shall they be shipped back, or held and paid for when sold? His last order for collars, which he says he sent you, was needed, and I this day ordered them of an Atchison firm, as you did not send them. I will try to call and see you as I return again from Nebraska. I will pay without complaint all that I buy, but do not wish to pay for what others buy, without orders, on my credit; but should I need the goods, will pay as above stated, if satisfactory.    Yours, etc.,

"P. M. GILBERT."

It seems that soon after writing the above letter, probably on the day of its date, Gilbert again left Oxford, to go to Richardson county, Nebraska, where he remained about twenty days before returning to Oxford. Very shortly after his return, Hart left his employment and left the place, or, as Gilbert termed it, "he had skipped out." Gilbert then carefully selected the goods which had been shipped to the store by the plaintiff, and shipped them back to the company at Kansas City. These, with the exception of the contents of one box which was claimed to have been lost in transit, were credited to Gilbert, but at a rate of discount not proven in evidence; and it is the difference between the price of these goods as sold and the amount credited Gilbert for the goods returned, that constitutes the amount of the matter in controversy between the parties. Gilbert seeks to justify himself in going away and leaving Hart in possession of his shop, after he had ascertained that he had been disobeying orders and making purchases without authority, on the ground, and giving as a reason therefor, that he had important and pressing business at Falls City, Neb., which demanded his immediate return to that place. An examination of all the evidence in the case, as well as that briefly summarized above, shows that the evidence is sharply conflicting. Had the jury implicitly believed the testimony of Gilbert, they could not have found for plaintiff. But disbelieving some portion of his statements as to important facts, and believing the contrary statements of Merriam and the Harts, which they evidently did, they were possibly justified in coming to the conclusion which they did in their verdict.

These goods were returned by Gilbert and received by plaintiff, no doubt in pursuance of some contract, agreement, or understanding, between them; but unfortunately the evidence as to what that agreement was is absolutely wanting on the part of Gilbert, and far from satisfactory on the part of plaintiff; and it is worthy of remark that

while plaintiff contends that the original sale of these goods was authorized and regular, it does not appear that there was the least objection raised to receiving them back upon Gilbert's claim that they were shipped to him not only without his authority, but against his express orders communicated to plaintiff.

The following is the testimony of Merriam as to this part of the case:

Q. Did you see Gilbert at any other time after this matter of Hart's account came into dispute between you?

A. Yes.

Q. What did he say when you saw him?

A. He came into the store and said he had shipped some goods back to us.

Q. How much did he claim in value he had shipped back?

A. I don't remember.

Q. What was said about paying you for the balance of the goods — the unpaid balance? Did you exchange accounts?

A. Yes; he sent the goods back to us, and we were to give him credit for them when received.

Q. You had that verbal understanding with him in your store?

A. Yes.

Q. You had been exchanging accounts when you got this complaint, March 4, between you and Hart? Did he agree your account was correct, the account you submitted to him?

A. Yes; there was no objection found as to the accounts that I know of.

Q. He agreed to pay the balance; do you remember how much the balance was?

A. The balance, after the goods were returned was something over $600.

Q. This he agreed to pay?

A. Yes.

Q. Who was there at the time he agreed to pay that—
who else besides you and Gilbert?

A. I don't remember.

Q. When was that; what time?

A. I think it was in April, 1886.

Q. Has he ever paid you that $600 he agreed to pay?

A. No, sir.

Q. Is that the amount expressed in this account?

A. Yes; about that.

Q. State if there is any other fact you know in connec-
tion with this matter, any conversation had with Gilbert.
The amount here expressed is $643.44.

A. The amount there is correct, I presume; I don't re-
member positively; I could tell by looking at the bill.
[Examining the bill.]     Yes; that is right.     There is the
balance; there is the memorandum of credits and of total
indebtedness, leaving a balance of $643.44.

Q. That was the agreed balance between you?

A. Yes.

Again, on cross-examination.

Q. You have examined these depositions?

A. Yes.

Q. State whether or not there is any such statement in
either of these depositions as you have made on the stand?

A. No, sir; that statement in reference to settlement of
account—there is nothing in this, and if I have made a
statement that Gilbert said he would pay the balance in
cash after the goods were returned, I wish to make a cor-
rection.     I got that impression, and always understood that
when the goods were returned the balance was to be paid
to us.     If I made that statement I wish to correct it.

Q. Didn't you swear a while ago that Gilbert and your-
self in your store in Kansas City had a positive—absolutely
positive—settlement and understanding that he was to pay
the whole of that bill—six hundred and some odd dollars

—and that he promised and agreed to pay that amount of money?

A. That is what I want to say.

Q. At that time, did you not say that?

A. If I said that I want to correct the impression.

Q. Didn't I ask you if you was as certain of that as of anything else, and you answered, yes, you were?

A. If I said so you could tell; and I want to say my impression was, the understanding always, when the goods were returned we were to give Gilbert credit for them, and he was to pay the balance.

Q. Then you wish the jury to understand as a matter of fact, there was no such agreement between you, as you thought a moment ago that there was?

A. I wish them to understand when the goods were returned they were to be credited, and the balance to be paid. I don't wish to say that Gilbert said he would pay the balance in dollars and cents; that was the impression that the members of our firm had, that the balance was to be paid.

Q. Didn't you read all this list to Gilbert when you received them?

A. Certainly.

Q. Don't you know what he claimed in this list?

A. I knew what he claimed.

Q. Where did you get the impression of his agreeing positively and absolutely that he would pay the bill, and not by your impression?

A. Because I thought we could hold him for them.

But the first assignment of error, as has been seen, is the giving of the second and third instructions of the court on its own motion:

" 2. If you find from the evidence that the goods described in the petition were sent by the plaintiff from Kansas City, consigned to defendant at Oxford, Kansas, and that the goods, according to such consignment, reached and were

placed into the store of defendant at Oxford, it will be for you to consider other matters contested in the proofs, among which is the question as to whether such shipments were by defendant's authority. If you find that defendant in person authorized the shipments, that would be a sufficient authority; but if you fail to find that defendant in person authorized the shipments, the next step on the question of authority is to determine whether he did so by agent. There is no evidence offered to show that any person other than W. N. Hart had authority as agent to authorize the said shipments. If you find that W. N. Hart was defendant's agent authorized to order the said goods, and that he did order them, that would bind defendant as effectually as though he made the order in person.

"If you find that when defendant was absent from his said store he left said Hart in possession and charge of the store for the purpose of carrying on the business of the store, and that the proper management of the store justified making orders for more goods to supply stock as depleted by trade, that would justify plaintiff in supplying and filling orders of said Hart as defendant's agent, unless plaintiff had knowledge of some limit to time of Hart's authority to make such orders. At the reception by plaintiff of the letter dated October 25, 1885, by them first offered in evidence, plaintiffs had notice to honor no order unless accompanied by defendant's name. That notice is binding on plaintiff unless after that defendant notified plaintiff to the contrary, or after that gave authority to Hart to make the orders for the goods in question, and that, pursuant to such authority given after the said letter of October 25, 1885, if any, Hart did order and receive the goods in question.

"If you find that Hart ordered and received the goods into the store, but at the time he did so had no authority so to do, you must find that the same was without defendant's authority, unless you find that defendant afterward

ratified such acts of Hart.    If defendant afterwards ratified the acts of Hart, they are binding on defendant as effectually as if authority had been conferred before the act ratified.    But if you fail to find that Hart's acts were by defendant's authority, and fail to find that afterwards defendant ratified the same, then you must find that defendant is not bound by such acts of Hart.    If you believe from the evidence that the goods in question were placed in defendant's store, and that afterwards he saw them there, and had full knowledge of all the facts and circumstances of how they got there, and from whom they were obtained, and that after such knowledge he permitted them to remain as part of the stock of the store exposed for sale, and by himself or authorized agent sold any part thereof and kept the proceeds of such sales, or part thereof, then you will find a ratification of the bringing of the goods into the store as to each order so ratified.

" 3.  The foregoing statements of the law are deemed sufficient to cover the issues joined by the pleadings so far as necessary for your guidance.  If you find that plaintiff sold and delivered to the defendant as alleged in the petition the goods therein mentioned, find for the plaintiff, and assess its damages as the sale price of the goods, with interest at seven per cent per annum from the time the same became due.  If you fail to so find, you will find for the defendant."

The second assignment is the refusal to give the first, second, and third instructions, asked for by the defendant, as follows:

" 1.  If the jury believe from the evidence that the defendant, before the sale of the goods sued for, notified plaintiff in writing to sell no goods unless his name accompanied the order, then, before they can recover, it is incumbent on them to show by satisfactory evidence that the order was either given by defendant in person or by some one duly authorized for that purpose.

"2. That an agent may have either general or special powers; and if the jury believe that the man Hart had only limited or special powers to manage the work of the shop, and no power to contract for or to buy goods, and that the plaintiffs at the time of dealing with him knew that to be the fact, then the defendant is not bound by the acts of Hart in that behalf unless he subsequently approved or ratified such acts.

"3. That if the jury believe from the evidence that the goods sued for were sent by plaintiffs to defendant's place of business at Oxford, Kansas, without the authority of and against the wish of defendant, and that as soon as defendant knew that such was the case, he repudiated the transaction and notified plaintiffs that they were subject to their order, and that he returned to them under their instructions said goods, then the defendant is not liable for said goods, nor for the value of any goods sold, lost, damaged, or stolen, before he knew of the receipt of the same at his place of business, unless he received or appropriated the proceeds of the same."

The contention between the parties then was narrowed down to the amount of goods returned by Gilbert to plaintiff, the price at which Gilbert should be credited therefor, and whether he had discharged his whole duty in respect to the return of the goods when he shipped them by the only railroad from Oxford to Kansas City, consigned to the plaintiff.

The consideration of this branch of the case, it will be seen by referring to the instructions given, was not submitted to the jury; and while it is true that the evidence applicable thereto is meager, and especially so on the part of defendant, yet it being the plaintiff's duty to present a case to justify a verdict and judgment in his favor, I do not think that the second and third instructions of the court to the jury, which profess to cover the whole case, and which ignore and leave out all consideration of this branch of the case, can be sustained.

For the same reasons the third instruction asked by defendant and refused, should have been given, and its refusal was error.

Upon the trial the defendant offered in evidence an account book which purported to contain on one page a ledger account kept in his own hand-writing against and in favor of the plaintiff. He stated on oath, "I simply kept a ledger account with them;" that said account had been fully paid; that there was some error in it; that it showed an over-payment of seventy cents, and a balance of that amount in defendant's favor; but that the account had been balanced nevertheless.

Upon cross-examination he stated that the book was made by himself; that it was contemporaneous with the transactions therein; was commenced when he commenced business with the plaintiff; that it was all in his own hand-writing; that the book was an old volume that used to belong to the land business; and that a sort of an account was kept by the bookkeeper, but that the part entered up here and offered in evidence was all in his own writing, and that no one else. had any business with it. The page of the book offered seems to have been admitted without objection. Upon the cross-examination of defendant by counsel for plaintiff he was asked:

Q. You spoke of a book that belonged to the harness shop?

A. This was my ledger.

Q. The ledger you kept in the harness shop?

A. Yes, when I kept accounts against my customers.

Q. And that was the ledger you left there with Hart?

A. No, sir; I did not leave this ledger with Hart; he never made any marks in it.

Q. Did you lock it up every day?

A. I didn't leave it with him.

Q. Where is the book he kept the accounts in when he done business?

A. There was a sale book.

Q. Have you got it handy?

A. Yes.

Q. I would like to see that very much.

(Defendant, by his counsel, objects to being required to produce any other book, because it is irrelevant, immaterial, and improper cross-examination; which objection being overruled, the defendant was ordered to produce the book in evidence, and did so.)

Q. Did Mr. Hart keep that book?

A. No; there is no keeping about that.

Q. Did Hart put a scratch in there?

A. Yes.

Q. Now tell the jury whether he kept it during the six weeks you were away?

A. I think likely he did.   *   *   *

(Defendant objected to any testimony concerning this book as not proper cross-examination. Objection overruled by the court, to which defendant excepts.

(Plaintiff offers in evidence the book copy attached to the bill of exceptions, marked "exhibit F, defendant," which is objected to and objection overruled, and defendant excepts.)

Q. Did you say Hart put this writing in there?

A. You asked if Hart made a scratch there.

Q. I will ask you if during the six weeks of your absence he had full charge of this book, while you were hundreds of miles away from it?

(Objected to and overruled, and exceptions taken.)

A. I cannot tell you. I see there are two or three different hand-writings in the book, and it is not Hart's altogether; when you get right down to that, I cannot tell you who kept it.

Q. Was this book in the harness shop?

A. I presume it was; I found it there.

Q. Was it not there when you left?

A. No; I think I left it in the bank, to the best of my knowledge. * * *

Q. Is any of this hand-writing Mr. Hart's?

(Objection made to identifying Hart's hand-writing in this manner as not proper cross-examination. Overruled by the court, and exception taken.)

Q. Is any of this writing the hand-writing of Hart?

Witness examines the book, and answers, "I don't see any of his yet; no."

Q. Do you know his hand-writing well?

A. Yes; that is, I ought to.

Q. There is his hand-writing?

A. There is his hand-writing on page 379.

(Plaintiff offers page 379, marked exhibit "X," in evidence. Defendant objects, and objection overruled. Exception taken.)

Q. This is the hand-writing of Hart?

A. I think it is.

Q. When did he show it to you?

A. He never showed it to me; I found it a month ago— this list of crooked orders. I happened to open it and look the bills over, and found the bills correspond with the list of orders made. * * *

Q. Was Swain in your shop when you went away?

A. Swain had gone then; I am mistaken about that being Swain's.

Q. Leave Swain alone, and come to the next to him.

A. I should say that from what I have seen of Hart's brother, that Hart had his brother make these entries; his brother was a better scribe than he was.

Q. You tell the jury you believe to the best of your knowledge it was done under the direction of Hart?

A. No, I don't; it is not W. N. Hart's hand-writing.

(Objected to; objection overruled; defendant excepts.)

Q. Is it his brother's hand-writing?

A. I cannot tell; I just surmise what it is. * * *

Q. Whoever was running shop kept that book?

A. It was his business if I was out and he sold a dollar's worth to enter it.

Plaintiff offers in evidence so much of the book as refers to the time that Hart was there in charge of the shop. Copy attached, marked plaintiff's exhibit "A 1."

Defendant objects that this book is in the custody of the court, and not proper cross-examination, and this is part of their case in chief; and objects, first, that this is not the proper time for plaintiff to interrupt the conducting of the defense to offer anything of that kind; second, because there has been no foundation laid, it is immaterial, irrelevant, and incompetent, and has no bearing on the issue in the case. There is a multitude of entries in the book, as shown by witness's testimony, not in his own hand-writing, by his authority nor knowledge, nor does he know who made them, and he should not be bound by such entries. It is further objected that there is a multitude of entries that have no relation to any part of this controversy, and can tend to nothing but to cumber the record. Objections overruled.

The plaintiff offers in evidence 44th page up to 71st page, January 1 up to March 25, inclusive; and pages 379, 380, 381, 382, and 384, of the cash-book, copies of which are marked plaintiff's exhibit "A." Objected that the last objection should follow this offer also. Objected further to the entry on page 379, that it does not state who the parties are with whom the account claims to have been made; and further, that it is disclosed in the testimony of defendant, already on the stand, in regard to this entry, that he did not make it, and never knew of its existence until last month, and don't know how it came there, and he should not be bound by it; that standing alone, as it does, no one can tell by inspection of it what it means; that in order to be binding upon anybody, it would have to have extrinsic evidence. All objections overruled.

Thereupon there was received by the court, read to the

jury, and attached to the bill of exceptions, twenty-six pages of an account book, containing entries of credit in favor of the plaintiff and charges against various other persons, chiefly devoted to memoranda of charges of money against W. N. Hart and R. V. Hart, and of various different sums of money deposited in bank.

There can be no doubt that it was error to receive this book of accounts in evidence. The statute provides distinctly in what cases, and upon what proof, account books may be given in evidence. (Sec. 346, Civil Code;. *Masters v. Marsh,* 19 Neb. 467; *Van Every v. Fitzgerald,* 21 Id. 36; *Holland v. Com. Bank,* 22 Id. 579; cited by counsel for plaintiff in error.) But at the consultation it was suggested that possibly the admission of this book in evidence, though error, was without prejudice to the plaintiff in error.

Upon a thorough examination of the case, I am satisfied that it was highly prejudicial to the plaintiff in error. Defendant, on the stand as a witness in his own behalf, had repeatedly testified that William N. Hart had deposited no money to his credit in the bank at Oxford, where he had been directed to deposit such sums as he might take in during defendant's absence, nor had he deposited any money to the credit of defendant in any bank. This book, which was allowed to go to the jury as evidence, contained nine entries of separate and distinct deposits of money in the Oxford bank, amounting to $478.77. Also, it was the theory of the defendant, upon which he predicated his defense, that his shop at Oxford was but a small, petty affair; that the entire stock in trade of said shop at the time of his departure, and during his absence, was worth but a few hundred dollars, and while it was a part of his theory that a large amount of goods had been ordered without authority, by W. N. Hart, and brought into the shop in his absence, yet it was also a part of his theory that but a very small amount of the goods had been disposed of by Hart or by any one else; and by the book introduced in evidence, and

laid before the jury, it appeared that a considerable amount of goods, at least one or two thousand dollars' worth, and probably more, had been disposed of by Hart in the absence of defendant.

This evidence, if true and properly admitted, not only would necessarily, but ought to, overturn the defense. It therefore must have been highly prejudicial. The case throughout is an involved and unsatisfactory one—involved in contradictions, and unsatisfactory as to veracity; and a due regard to justice, good practice, and fair dealing, requires that there should be a new trial.

The judgment of the district court is therefore reversed, and the cause remanded for further proceedings in accordance with law.

REVERSED AND REMANDED.

THE other Judges concur.